IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,716

STATE OF KANSAS,
*Appellee*,

v.

YUSUF T. MCCRAY,
*Appellant*.

SYLLABUS BY THE COURT

1.

A statute's constitutionality is a question of law subject to unlimited review.

2.

The primary rule of statutory construction is that legislative intent controls. When the statutory language is plain and unambiguous, courts must apply its ordinary meaning without reading something into it not readily found in its words.

3.

By its plain terms, K.S.A. 21-6301(a)(18) reflects a legislative intent to disarm individuals who, within the past five years, have violated, attempted to violate, or threatened the physical safety of a family member, intimate partner, or partner's child.

4.

Under the Second Amendment to the United States Constitution, a modern firearm regulation is constitutional only if it accords with the nation's historical tradition of firearm regulation, requiring courts to determine whether the challenged law is relevantly similar to historical analogues; the modern regulation need not be a dead ringer or

historical twin, but it must be reasonably analogous and consistent with Second Amendment principles.

5.

For Second Amendment purposes, firearm restrictions based on domestic-violence misdemeanor convictions fall within the nation's historical tradition; thus, legislatures may reasonably disarm individuals whose past conduct has demonstrated a propensity for violence in intimate or domestic settings.

Review of the judgment of the Court of Appeals in an unpublished opinion filed December 13, 2024. Appeal from Sedgwick District Court; TYLER J. ROUSH, judge. Oral argument held September 10, 2025. Opinion filed November 14, 2025. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Randall Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.: While responding to a domestic disturbance at Yusuf Tremel McCray's home, police discovered a rifle inside, which he was prohibited from having due to a recent conviction for misdemeanor domestic battery. The State charged him with one count of felony criminal use of a weapon under K.S.A. 21-6301(a)(18), which prohibits individuals from possessing a firearm for five years after being convicted of a misdemeanor domestic violence offense. McCray moved to dismiss the charge, arguing the statute violates the Second Amendment right to bear arms because firearm restrictions for domestic violence and misdemeanor offenders are not rooted in America's historical

tradition of firearm regulation, as required by *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 26-31, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022). The district court denied the motion and a jury convicted McCray as charged. A Court of Appeals panel affirmed McCray's conviction, holding K.S.A. 21-6301(a)(18) is constitutional in restricting individuals convicted of domestic violence offenses from possessing firearms. We granted McCray's petition for review to consider his Second Amendment challenge.

On review, we affirm the panel's decision. Like early surety laws, K.S.A. 21-6301(a)(18) restricts possession of firearms by individuals who pose a threat of physical violence to others. A conviction for misdemeanor domestic violence within the preceding five years is sufficient, as a matter of law, to establish that the offender poses a threat of physical violence to others. The statute is therefore consistent with America's tradition of firearm regulation and constitutional under the Second Amendment to the United States Constitution.

FACTS

Early in the morning on December 17, 2022, Wichita police officers responded to a reported domestic disturbance at a mobile home that McCray shared with his romantic partner and their young children. The woman told dispatch that McCray was at the residence causing a disturbance and had pulled out a gun. Upon arrival, officers heard yelling from inside the trailer, including a woman's voice saying, "[W]hy don't you just leave me alone[?]" Once inside, the officers spoke separately with McCray and the woman in different areas of the home.

Before heading to a back bedroom to speak with McCray, one of the officers observed a rifle box sitting on the living room couch. The officer's body camera recorded the interview with McCray in the bedroom. In the footage, McCray said he and the

3

woman had an argument that led her to call 911 and tell police he had a gun, "which I'm not supposed to have." McCray also mentioned that he was on probation. McCray denied that a gun was involved in the altercation. He said he had gathered some of his belongings because he planned to leave for the night to let things "cool down"; he later explained this is why the gun was out when police arrived.

Meanwhile, the woman informed another officer that there was a gun in the box on the couch and that McCray had shown it to her as he was packing up his things. She said McCray did not point the gun at her or make threats.

One of the officers ran a background check on McCray and learned that he was prohibited from possessing a firearm due to a prior conviction. Officers then arrested McCray. After obtaining consent to search the premises, they opened the rifle box and retrieved a Ruger AR-556 rifle and two magazines loaded with .220 caliber bullets. McCray admitted the gun belonged to him.

The State charged McCray with criminal use of a weapon under K.S.A. 21-6301(a)(18), a severity level 8 nonperson felony, for knowingly possessing a firearm within five years of being convicted of a misdemeanor domestic violence offense. Several months earlier, in September 2022, McCray pled guilty to violating Wichita Municipal Ordinance (W.M.O.) § 5.10.025(a)(1), a misdemeanor crime of bodily harm domestic battery, and received 12 months' probation. The "Plea and Waiver of Trial" entered in municipal court for the domestic battery conviction stated: "I understand that if this is a conviction of [domestic violence] I cannot possess any firearm for 5 years from the date of conviction. Possession of a firearm after a conviction of [domestic violence] is a felony in Kansas." McCray signed or initialed that he understood this information.

4

In a pretrial motion to dismiss the criminal use of a weapon charge, McCray argued that K.S.A. 21-6301(a)(18) violates the Second Amendment right to bear arms. McCray did not assert a claim under section 4 of the Kansas Constitution Bill of Rights. The district court denied the motion and granted the State's motion to prevent McCray from raising this constitutional issue during trial.

At trial, McCray stipulated to the prior misdemeanor conviction under W.M.O. § 5.10.025(a)(1). The district court granted McCray's motion to redact from the stipulation the type of prior conviction, so the description "domestic violence" was redacted from the form that was ultimately shown to the jury. Despite the stipulation, McCray maintained he was unaware that the prior conviction prohibited him from possessing a firearm.

The jury ultimately convicted McCray as charged, and the court imposed a 7-month prison sentence, suspended to 18 months' supervised probation. On direct appeal, McCray challenged his conviction, alleging insufficient evidence to support the conviction, a violation of the Second Amendment, and prosecutorial error. A Court of Appeals panel affirmed, finding that sufficient evidence supported McCray's conviction, K.S.A. 21-6301(a)(18) is constitutional, and any prosecutorial error in misstating certain facts during closing argument was harmless. *State v. McCray*, No. 126,716, 2024 WL 5103014, at *1 (Kan. App. 2024) (unpublished opinion).

This court granted McCray's petition for review challenging the panel's finding that K.S.A. 21-6301(a)(18) is constitutional in restricting firearm possession by individuals convicted of a misdemeanor domestic violence offense. See *McCray*, 2024 WL 5103014, at *1, 8.

5

McCray asserts the panel erred in finding K.S.A. 21-6301(a)(18) constitutional. In support of error, he contends this subsection of the statute violates the Second Amendment right to bear arms because it has no historical analogue in America's tradition of firearm restriction.

Before addressing the merits of McCray's Second Amendment claim, we pause to outline the steps of our analysis. We begin by clarifying the scope of McCray's challenge and the proper method of analysis under K.S.A. 21-6301(a)(18). Next, we interpret the statute's text and legislative purpose to understand what the Legislature sought to accomplish. We then apply the Second Amendment framework articulated by the United States Supreme Court by comparing the Kansas statute with relevant historical analogues. Finally, we address McCray's specific arguments—that the statute is invalid because it lacks a finding of future dangerousness, because it applies to misdemeanants rather than felons, and because it has no identical historical precedent. With this roadmap in place, we turn to the issues in order.

I.      *Standard of review and burden of proof*

A statute's constitutionality is a question of law subject to unlimited review. Appellate courts generally presume statutes are constitutional and resolve all doubts in favor of a statute's validity. *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018).

Throughout this case, McCray has challenged the statute's constitutionality as applied to his facts and implicitly on its face. Because McCray asserts a violation of the Second Amendment to the United States Constitution, our standard of review and governing framework are controlled by United States Supreme Court precedent

interpreting that provision. Accordingly, we apply federal constitutional principles as articulated by the Supreme Court. A successful facial challenge generally requires a litigant to establish that the law is unconstitutional in all its applications. Thus, for the State to prevail in a facial challenge, it need only demonstrate that the law is constitutional in at least some applications. *United States v. Rahimi*, 602 U.S. 680, 693, 701, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024) (citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 [1987]).

II.      *Preservation and proper method of analysis*

McCray challenged the constitutionality of K.S.A. 21-6301(a)(18) in a pretrial motion to dismiss, arguing the statute violated the Second Amendment. On appeal, he claimed the State had to justify disarmament both for (1) any misdemeanor conviction and (2) domestic violence convictions. The panel agreed that he had raised a Second Amendment challenge, but concluded he had preserved only the domestic violence argument, not the broader misdemeanor argument. The panel also held that McCray failed to explain why the appellate court could nevertheless consider the broader issue. *McCray*, 2024 WL 5103014, at *5-6. On review, McCray claims the panel erred, arguing that once a federal constitutional claim is raised, a party is not limited to the specific arguments made below.

Although we agree that the panel erred, it is not for the reasons cited by McCray. The panel treated the statute as if it created two prohibitions, one for domestic violence offenders and one for misdemeanants. This division misconstrues the statute. The plain language of K.S.A. 21-6301(a)(18) makes clear that it is a combined category—persons convicted of misdemeanor domestic violence offenses—which triggers disarmament. The Legislature did not enact a general prohibition on all misdemeanants, nor did it impose a sweeping disarmament of all domestic violence offenders regardless of conviction level.

7

Instead, it prohibits firearm possession by those whose convictions reflect both elements: a misdemeanor conviction and conduct constituting domestic violence. Accordingly, the relevant constitutional question is whether the Legislature may disarm misdemeanor domestic violence offenders under the Second Amendment. That is the statute the Legislature passed, the law McCray challenged, and the constitutional issue properly before this court. By reframing McCray's challenge in terms of two bans, the Court of Appeals effectively tested a statute the Legislature did not enact.

Once the statute is properly understood, the preservation inquiry largely falls away, because McCray's motion below challenged the constitutionality of the statute in precisely the form in which it exists. He did not need to raise two arguments corresponding to two different subcategories since the statute prohibits a single category of person from possessing a firearm: persons convicted of a misdemeanor domestic violence offense within the preceding five years. And these features of the statute are inseparable.

III.     *Statutory interpretation of K.S.A. 21-6301(a)(18)*

A.     *Text and definition*

Statutory interpretation presents a question of law over which appellate courts have unlimited review. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022). "The most fundamental rule of statutory interpretation is that the Legislature's intent governs if we can ascertain that intent." *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). Appellate courts must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meaning. *State v. Eckert*, 317 Kan. 21, 27, 522 P.3d 796 (2023). When a statute is plain and unambiguous, appellate courts should not speculate about the legislative intent beyond that clear language and

8

should refrain from reading something into the statute not readily found in its words. *Betts*, 316 Kan. at 198.

K.S.A. 21-6301(a)(18) provides:

"(a) Criminal use of weapons is knowingly:

 . . . .

(18) possessing any firearm by a person who, within the preceding five years, has been convicted of a misdemeanor for a domestic violence offense, or a misdemeanor under a law of another jurisdiction which is substantially the same as such misdemeanor offense."

The statute defines "domestic violence" as "the use or attempted use of physical force, or the threatened use of a deadly weapon, committed against a person with whom the offender is involved or has been involved in a dating relationship or is a family or household member." K.S.A. 21-6301(m)(1).

By its plain terms, the statute reflects a legislative intent to disarm individuals who, within the past five years, have violated, attempted to violate, or threatened the physical safety of a family member, intimate partner, or partner's child.

B.     *Legislative purpose and policy context*

Based on the plain language of the statute, the Legislature's purpose was to reduce the risk of violence in domestic settings by temporarily disarming those recently found guilty of domestic violence offenses. This purpose aligns with broader national policy concerns. The United States Supreme Court has repeatedly recognized that "'[f]irearms and domestic strife are a potentially deadly combination'" and cited the troubling

9

statistics that have informed legislative policy in this area. *Voisine v. United States*, 579 U.S. 686, 689, 136 S. Ct. 2272, 195 L. Ed. 2d 736 (2016) (quoting *United States v. Hayes*, 555 U.S. 415, 427, 129 S. Ct. 1079, 172 L. Ed. 2d 816 [2009]). "Domestic violence often escalates in severity over time, and the presence of a firearm increases the likelihood that it will escalate to homicide. [Citation omitted.]" *United States v. Castleman*, 572 U.S. 157, 160, 134 S. Ct. 1405, 188 L. Ed. 2d 426 (2014) (citing Department of Justice study showing "'[w]hen a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed'").

For a time, gun control laws only targeted convicted felons, while many perpetrators of domestic violence were charged with misdemeanors, if charged at all—"notwithstanding the harmfulness of their conduct." *Voisine*, 579 U.S. at 689 (citing *Castleman*, 572 U.S. at 160); *United States v. Jackson*, 138 F.4th 1244, 1253 (10th Cir. 2025) (explaining why felon disarmament laws were not effective in preventing domestic abusers from accessing firearms).

To close this "dangerous loophole," Congress enacted 18 U.S.C. § 922(g)(9), a firearm ban on individuals convicted of misdemeanor crimes of domestic violence—"just like those convicted of felonies." *Voisine*, 579 U.S. at 695; *Hayes*, 555 U.S. at 418. Section 922(g)(9) makes it "unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence . . . to . . . possess in or affecting commerce, any firearm or ammunition." Many states have followed suit to restrict firearms from domestic violence misdemeanants. K.S.A. 21-6301(a)(18) appears to serve this function under Kansas law, but with a narrower, five-year restriction.

With the statute's text, purpose, and federal analogue established, we turn to the constitutional framework that governs Second Amendment challenges.

10

IV.    *Second Amendment legal framework*

The Second Amendment to the United States Constitution states, in relevant part, "the right of the people to keep and bear Arms, shall not be infringed." This provision secures the fundamental and individual right to possess and carry weapons for lawful purposes, and applies to the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 791, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 594-95, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). But like other constitutional rights, the right to keep and bear arms is not unlimited. 554 U.S. at 626 (qualifying that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose").

A.    *The* Bruen *test*

To resolve a Second Amendment challenge, a court must determine whether the challenged law fits within our nation's "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. This standard, often called the "*Bruen* test," requires courts to use analogical reasoning—specifically, to determine "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by assessing whether the two are "relevantly similar." 597 U.S. at 28-29. The challenged law need not be a "dead ringer" or "historical twin" with an early law, but it must be reasonably analogous and consistent with the principles underlying the Second Amendment. 597 U.S. at 30.

Key to this inquiry involves considering "why and how" the law burdens the Second Amendment to discern whether "modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 597 U.S. at 29. Thus, to survive constitutional scrutiny, the modern law must restrict firearms for a comparable reason as an early law (the *why* or

11

purpose) and do so to a comparable extent (the *how* or means).

        B.       *Historical analogues identified in* Rahimi

Two years after *Bruen*, the Court decided *Rahimi*. This case was decided during McCray's appeal but after the parties filed their briefs, so they did not have the benefit of that ruling before making arguments to the panel on appeal. See *McCray*, 2024 WL 5103014, at *6. Nevertheless, the panel relied heavily on *Rahimi*'s rationale to find K.S.A. 21-6301(a)(18) constitutional.

Rahimi was convicted under 18 U.S.C. § 922(g)(8), which prohibits persons under a domestic violence restraining order from possessing a firearm if the order expressly finds they pose a credible threat to the safety of an intimate partner or the partner's child. Rahimi challenged his conviction, arguing the law was unconstitutional on its face under the Second Amendment. Applying the *Bruen* test, the Court rejected the Fifth Circuit's strict demand for an exact "historical twin," explaining that modern regulations are valid if they are "relevantly similar" to historical analogues and serve comparable purposes. *Rahimi*, 602 U.S. at 699-701.

Recalling the historical background on American gun laws set forth in *Heller* and *Bruen*, the Court noted that early restrictions "included provisions barring people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693. The Court identified two types of early legal regimes that served this purpose: "surety laws" and "going armed laws." 602 U.S. at 693-98.

Surety laws started with an old English system called "frankpledge," where groups of 10 men promised to watch over each other's behavior, and if one broke the law, the rest were responsible for turning him in or facing punishment. Over time, this became the

surety system, where courts could require people—if there was probable cause to think they might commit violence—to post a bond (a kind of financial guarantee) promising good behavior. If they refused, they could be jailed; if they posted the bond but later broke the peace, they would lose the money. These laws were often used to prevent violence in the home. For example, wives could ask courts to require their husbands to post bonds to ensure they behaved or stopped abuse, and vice versa. This gave communities an alternative to public shaming or vigilante justice. Importantly, surety laws also applied to weapons. Massachusetts and other states passed laws allowing courts to require bonds from people who, on probable grounds, were found carrying dangerous weapons—including guns—in threatening ways. *Rahimi*, 602 U.S. at 695-96 (citing various historical authority).

While surety laws were meant to stop violence before it happened, another set of laws punished people who frightened others by carrying weapons. These were called "going armed" laws, which grew out of older "affray" laws that banned fighting in public. Over time, courts and lawmakers treated "going armed" as its own offense—prohibiting people from carrying dangerous or unusual weapons in a way that terrified the public. Doing so threatened public order and often led to violence, so the punishment could include losing the weapons and going to jail. These rules carried over into America. Some states, including Massachusetts, New Hampshire, North Carolina, and Virginia, passed laws against going armed, and courts in other places enforced the same idea under common law. *Rahimi*, 602 U.S. at 697 (quoting 4 Blackstone, Commentaries on the Laws of England 149 [10th ed. 1787]).

Given the purpose of these early legal regimes was to prevent violence, including by disarming a potential offender, the Court had "no trouble concluding that [18 U.S.C. §] 922(g)(8) survives Rahimi's facial challenge [because our] tradition of firearm regulation allows the Government to disarm individuals who present a credible

13

threat to the physical safety of others." *Rahimi*, 602 U.S. at 700. In other words, the statute is "comparably justified" to early firearm restrictions because it serves a common purpose. 602 U.S. at 695, 698-99; see *Bruen*, 597 U.S. at 29. The Court also found the statute restricts firearms to a similar extent as early such laws—*narrowly and temporarily*—thus imposing a "comparable burden" on Second Amendment rights. *Rahimi*, 602 U.S. at 699-700; see *Bruen*, 597 U.S. at 29.

The United States Supreme Court has not yet considered a Second Amendment challenge to firearm restrictions on domestic violence misdemeanants. However, in the wake of *Rahimi*, a number of federal appellate circuits have applied the *Bruen* framework and the Court's reasoning in *Rahimi* to uphold 18 U.S.C. § 922(g)(9), a permanent federal firearm ban on domestic-violence misdemeanants.

Post-*Rahimi*, the Sixth Circuit was the first to reconsider § 922(g)(9) in *United States v. Gailes*, 118 F.4th 822 (6th Cir. 2024). Gailes, a repeat domestic violence offender with multiple past convictions, was charged under the statute after police discovered two loaded pistols in his vehicle after a car accident. Applying the *Bruen* test in light of *Rahimi*, the *Gailes* panel found that surety laws and going armed laws are sufficient historical analogues to justify the statute since they share a common purpose to disarm individuals who pose a clear threat of physical violence to another. 118 F.4th at 828. While acknowledging these early legal regimes did not specifically target domestic violence offenders, the *Gailes* panel surmised from *Rahimi* that *Bruen* permits a looser comparison. 118 F.4th at 828. Like the *McCray* panel, the *Gailes* panel dismissed the argument that *Rahimi* does not apply to domestic violence misdemeanants, reasoning "if someone who is merely accused of committing domestic violence can be disarmed without offending the Second Amendment, then *a fortiori* someone with a valid conviction can also be disarmed." 118 F.4th at 829.

14

Next, in *United States v. Bernard*, 136 F.4th 762 (8th Cir. 2025), the Eighth Circuit also upheld § 922(g)(9) against a facial Second Amendment challenge. The panel concluded that § 922(g)(9) is consistent with this nation's historical tradition of firearm regulation to the extent it targets individuals convicted of misdemeanor domestic violence offenses—offenses that necessarily involve violence or threatened force against a domestic partner. 136 F.4th at 765-66. The panel found that, in at least some applications, the statute constitutionally disarms persons who present a credible threat to the physical safety of others. Accordingly, it affirmed the judgment of conviction, holding that § 922(g)(9) is not facially invalid under the Second Amendment. 136 F.4th at 766.

Similarly, in *United States v. Nutter*, 137 F.4th 224 (4th Cir. 2025), the Fourth Circuit upheld the constitutionality of § 922(g)(9) against a facial Second Amendment challenge. Applying *Bruen* and *Rahimi*, the panel concluded that § 922(g)(9) is consistent with this nation's historical tradition of firearm regulation because early surety and going-armed laws demonstrate a settled practice of disarming individuals who pose a credible threat to the safety of others. 137 F.4th at 231-32. The panel acknowledged that § 922(g)(9) reaches misdemeanants, lasts longer, and operates more categorically than some historical laws, but found these differences insufficient to render the statute facially invalid, since it has a "'plainly legitimate sweep'" in disarming domestic violence offenders who present a heightened risk of future violence. 137 F.4th at 230 (citing *United States v. Canada*, 123 F.4th 159, 161 [4th Cir. 2024] [citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008)]).

A Tenth Circuit panel came to the same conclusion in *Jackson*, which also involved a Second Amendment challenge to § 922(g)(9). 138 F.4th at 1254. Due to a prior domestic violence conviction, Jackson was charged for unlawful possession of

firearms found in a backpack at his home during searches related to other crimes. Like McCray, Jackson argued that there is no historical tradition for disarming misdemeanants and *Rahimi* should be construed only to permit firearm restrictions of persons found to pose an *immediate threat* to the physical safety of others. The court found *Rahimi* did not support Jackson's argument. The panel instead viewed *Rahimi* broadly as permitting individuals to be disarmed if they pose "'a clear threat of physical violence to another'" and found that a conviction of domestic violence meets this criterion. 138 F.4th at 1254-55 (observing domestic violence convictions constitute "'judicial determinations'" that one engaged in violence against a family member or intimate partner and demonstrate a "'propensity for the use of physical violence against others'").

Finally and most recently, in *United States v. Simmons*, 150 F.4th 126 (2d Cir. 2025), the Second Circuit also confronted a *Bruen* challenge by Simmons to § 922(g)(9). Simmons pled guilty to violating the statute on the basis of a prior conviction for third-degree assault of the mother of his infant child and subsequent possession of a .380 caliber pistol, but later challenged his conviction on Second Amendment grounds. The panel acknowledged this country's long "'tradition of status-based, categorical restrictions on firearms possession'" which reflects assent to "'legislative power, consistent with the Second Amendment, to disarm categories of persons presumed to be dangerous.'" 150 F.4th at 133 (quoting *Zherka v. Bondi*, 140 F.4th 68, 90 [2d Cir. 2025]). And as expressed through prior federal caselaw, the panel recognized the potent combination of firearms and domestic strife and stated purpose of § 922(g)(9) to close a "dangerous loophole" in gun control laws by disarming those convicted of a misdemeanor crime of domestic violence. 150 F.4th at 132. Based on these considerations and guided by *Bruen* and *Rahimi*, the panel concluded the statute "fits squarely within this nation's history of disarming those considered to be a danger to the physical safety of others" and thus upheld it as constitutional both facially and as applied to Simmons. 150 F.4th at 134.

16

These federal decisions reinforce the conclusion that firearm restrictions based on domestic-violence misdemeanor convictions fall within the historical tradition recognized in *Bruen* and applied in *Rahimi*. They also confirm that legislatures may reasonably disarm individuals whose past conduct has demonstrated a propensity for violence in intimate or domestic settings.

V.     *K.S.A. 21-6301(a)(18) satisfies* Bruen/Rahimi

Under *Bruen* and *Rahimi*, we now ask whether K.S.A. 21-6301(a)(18) serves a historically comparable purpose (why) and imposes a comparably justified burden (how) on the right to armed self-defense.

A.     *Why:  preventing violence through temporary disarmament*

K.S.A. 21-6301(a)(18) is directed at individuals who, within the preceding five years, have been adjudicated guilty of a misdemeanor domestic violence offense. By definition, such offenses involve the use, attempted use, or threatened use of force against a household member, intimate partner, or family member. See K.S.A. 21-6301(m)(1). The Legislature thus acted against a subset of offenders whose conduct has already been judicially determined to involve violence or credible threats of violence in the domestic sphere.

This preventive purpose aligns with the historical tradition recognized in *Rahimi*. As the Court explained, legislatures may disarm those who present a danger of interpersonal violence, and surety and going-armed laws from the founding era confirm that disarming individuals deemed threats to public peace was consistent with the Second Amendment. 602 U.S. at 697-700. The Kansas statute fits comfortably within that tradition:  it targets only those who, through criminal conviction, have demonstrated a

17

propensity to endanger the safety of others in intimate or household settings.

### B.    *How:  narrow and temporary burden*

The means chosen by the Kansas Legislature are also consistent with historical tradition. Unlike categorical or permanent prohibitions, K.S.A. 21-6301(a)(18) imposes a limited five-year restriction, after which an individual's firearm rights are restored. This temporary prohibition is substantially narrower than its federal counterpart, 18 U.S.C. § 922(g)(9), which bars firearm possession by domestic violence misdemeanants indefinitely, subject only to limited relief such as pardon or expungement. See 18 U.S.C. § 921(a)(33)(B)(ii); *Jackson*, 138 F.4th at 1254 (discussing conditions under which section 922[g][9]'s firearm ban may be removed); *Gailes*, 118 F.4th at 829 (similarly explaining the "purported permanent ban in § 922[g][9] may not always be so").

Viewed through *Bruen*'s "why and how" framework, the Kansas statute is a measured exercise of legislative authority. It serves the historically recognized purpose of preventing interpersonal violence while imposing a narrower and less onerous burden than the comparable federal law. In this respect, K.S.A. 21-6301(a)(18) accords with the Second Amendment's text and our nation's historical tradition of firearm regulation.

### C.    *Facial and as-applied validity*

Because K.S.A. 21-6301(a)(18) targets only those recently convicted of domestic violence misdemeanors, it falls within the tradition of disarming persons who pose a risk of interpersonal harm. That conclusion defeats both McCray's facial and as-applied challenges.

18

To prevail on a facial challenge, McCray must show that the statute is unconstitutional in all its applications. See *Rahimi*, 602 U.S. at 693 (citing *Salerno*, 481 U.S. at 745). He cannot do so. The statute plainly applies constitutionally in at least some circumstances—for example, to individuals recently convicted of violent domestic assaults—because historical analogues support temporary disarmament of those who have demonstrated a propensity for violence.

Nor does the statute fail as applied to McCray. His circumstances demonstrate the precise risks the Legislature intended to address. Only months before officers discovered the rifle in his home, McCray pled guilty to misdemeanor domestic battery under W.M.O § 5.10.025(a)(1). That conviction required a judicial determination that he used or attempted physical force against an intimate partner. The short temporal distance between this conviction and his firearm possession confirms the Legislature's concern with the heightened risk of violence during the immediate years following such an offense.

Moreover, McCray was serving a term of probation at the time, and the record shows he had signed plea paperwork acknowledging that state law prohibited him from possessing a firearm for five years. These features reflect both judicial supervision and actual notice of the firearm restriction.

The circumstances of McCray's firearm possession also underscore the statute's preventive purpose. Police responded to a domestic disturbance at the residence he shared with his partner and their children. They discovered a rifle in plain view and confirmed McCray's ownership. Although the evidence did not show he brandished the weapon, its presence in the midst of a volatile domestic dispute exemplifies the very risk of escalation the Legislature sought to avoid. As the United States Supreme Court has recognized, "[d]omestic violence often escalates in severity over time, and the presence of a firearm increases the likelihood that it will escalate to homicide." *Castleman*, 572 U.S. at 160.

19

Finally, the statute imposed only a limited burden on McCray's Second Amendment rights. K.S.A. 21-6301(a)(18) restricts his firearm possession for five years following conviction, after which his rights are restored without the need for additional proceedings. This temporary prohibition is substantially less onerous than the permanent federal restriction in 18 U.S.C. § 922(g)(9). Viewed in this light, the statute is a measured response to demonstrated violence and aligns with the historical tradition of disarming those who pose a credible threat to the safety of others.

In sum, K.S.A. 21-6301(a)(18) is constitutional for Second Amendment purposes both on its face and as applied to McCray. His recent conviction for a violent domestic offense, his probationary status with explicit notice of the firearm prohibition, and his possession of a rifle during a renewed domestic disturbance confirm that the statute operated exactly as intended—to reduce the risk of lethal escalation in domestic settings.

VI.    *McCray's specific arguments supporting his Second Amendment challenge*

McCray challenges the panel's conclusion that K.S.A. 21-6301(a)(18)—which prohibits individuals from possessing a firearm for five years after being convicted of a misdemeanor domestic violence offense—is constitutional under the Second Amendment. McCray submits three arguments to support his challenge. First, he contends that under *Rahimi*, firearm restrictions are valid only if tied to a judicial finding of future dangerousness. Second, he argues that restrictions triggered by misdemeanor convictions, rather than felonies, fall outside the scope of the historical tradition of firearm regulation. Third, he claims that the absence of an identical historical analogue undermines the statute's constitutionality. We address each of McCray's arguments in turn.

20

A.    *Future dangerousness under* Rahimi

Given *Rahimi*, McCray does not completely dispute the government's authority to impose firearm restrictions following a misdemeanor domestic violence conviction. Rather, he argues that to comply with the Second Amendment, *Rahimi* requires these restrictions to "be tied to future dangerousness" (acknowledging, by contrast, K.S.A. 21-6301[a][17], which includes such a finding, is "probably . . . constitutional under *Rahimi*"). Thus, McCray claims the State can only restrict the Second Amendment rights of a person convicted of domestic violence if the statute requires an explicit finding of "future dangerousness."

McCray's claim is without merit. The statute at issue in *Rahimi* applied only to individuals subject to a domestic violence *restraining order* after a judicial determination that they "represent[] a credible threat to the physical safety of another" while the order is in effect. The Court held this statute is one way to identify when an individual poses a clear threat of physical violence to another and thus warrants being disarmed, consistent with early legal regimes of preventative justice. But its main holding appears broader than this single application: "Our tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." 602 U.S. at 700. *Rahimi* may imply a higher standard for firearm restrictions imposed *before* a person has demonstrated or attempted violence that would amount to a crime, but nothing in the decision can be read to preclude the government from disarming a person *after* a violence-related conviction. See *Jackson*, 138 F.4th at 1255 ("Nothing about [*Rahimi*'s] holding suggests only those posing an immediate threat may be disarmed.").

*Jackson* offers a more reasonable interpretation of *Rahimi* in this context, finding that a domestic violence conviction constitutes a "judicial determination" that an offender has engaged in violence towards a family member or intimate partner and demonstrates a

21

propensity to do so again. 138 F.4th at 1254-55. Given the historical basis for restricting firearms to mitigate a risk of interpersonal violence, including domestic violence, *Jackson* concluded laws that disarm domestic violence offenders are "consistent with this nation's tradition of firearm regulation." 138 F.4th at 1254.

B.     *Historical analogues, not historical twins*

Like the appellant in *Jackson*, McCray highlights the absence of "identical historical antecedents" to justify a modern firearm restriction on domestic violence misdemeanants. 138 F.4th at 1254-55. The United States Supreme Court made clear in *Heller* that it was not undertaking "an exhaustive historical analysis . . . of the full scope of the Second Amendment." 554 U.S. at 626. Since then, the Court has repeatedly cautioned against searching for a "'historical twin'" rather than a "relevantly similar" analogue:  "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at 30 (discussing how fixed historical meanings informing the scope of constitutional rights can be constitutionally applied to new, modern circumstances). The requisite comparative analysis to satisfy the Second Amendment simply does not require the close parity that McCray insists upon.

Nor would such a comparison be particularly useful. A significant body of legal scholarship explains why the comparison between historical and modern concepts of misdemeanor and felony offenses is complicated at best and, at worst, flawed. See generally Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461 (2009). That said, exploration of this authority is not necessary here because the relevant historical record disposes of

22

McCray's claim more directly. According to Blackstone, which the United States Supreme Court has relied on extensively in Second Amendment decisions, early surety laws were not only issued based on a potential threat of physical violence, but were also imposed after criminal convictions, including serious misdemeanors, with the aim of preventing recidivism:

> "This preventive justice consists in obliging those persons, whom there is a probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance to the public, that such offence as is apprehended shall not happen; by finding pledges or securities for keeping the peace, or for their good behaviour. *This requisition of sureties has been several times mentioned before, as part of the penalty inflicted upon such as have been guilty of certain gross misdemeanors; but there also, it must be understood rather as a caution against the repetition of the offence, than any immediate pain or punishment.*" (Emphasis added.) 4 Blackstone, Commentaries on the Laws of England 248 (3d ed. 1770).

Given *Rahimi*'s rationale, this historical authority strongly supports the conclusion that surety laws provide a sufficient analogue for a modern firearm restriction based on a misdemeanor crime of domestic violence, a serious offense despite not being classified as a felony.

CONCLUSION

All told, *Rahimi*'s holding logically extends to this case and supports upholding K.S.A. 21-6301(a)(18) as constitutional. Under *Rahimi*, the government may "disarm individuals who present a credible threat to the physical safety of others" consistent with the Second Amendment. See 602 U.S. at 700. Such restrictions fit within the tradition of firearm regulation because they similarly mitigate the risk of interpersonal violence—including domestic violence—addressed by early preventative justice laws. In particular, surety laws were imposed following serious misdemeanor convictions to prevent a

repetition of the offense. As the panel found, K.S.A. 21-6301(a)(18) similarly "applies to individuals found to threaten the physical safety of another" based on a prior misdemeanor conviction of domestic violence and so is comparably justified. *McCray*, 2024 WL 5103014, at *7.

As to the permissible burden on Second Amendment rights, *Rahimi* expressly did not rule out broader firearm bans for "categories of persons thought by a legislature to present a special danger of misuse," while affirming a narrow and temporary firearm ban as clearly constitutional. 602 U.S. at 698-99 (noting, in contrast to the blanket hand-gun ban overturned in *Heller*, the statute applies only to individuals subject to a domestic violence restraining order after a judicial determination that they "represent[] a credible threat to the physical safety of another" while the order is in effect—in Rahimi's case, one to two years following his release from prison) (citing *Heller*, 554 U.S. at 626). Here, too, K.S.A. 21-6301(a)(18) narrowly applies to individuals who have been convicted of a misdemeanor domestic violence offense for a temporary period lasting five years post-conviction. As the panel reasonably concluded, this statutory limit indicates the Legislature intended to restrict firearms only from "those who have recently engaged in domestic violence." See *McCray*, 2024 WL 5103014, at *8. K.S.A. 21-6301(a)(18) thus imposes a comparable burden on Second Amendment rights.

Finally, though not required by *Bruen*, K.S.A. 21-6301(a)(18) inherently includes the procedural safeguard of a "judicial determination" that an individual poses a risk of physical violence towards others in the form of an established domestic violence conviction, which is consistent by extension with *Rahimi*. See *Jackson*, 138 F.4th at 1254-55.

Because K.S.A. 21-6301(a)(18) fits within America's tradition of firearm regulation and thus is constitutional under the Second Amendment, facially and as

applied to the facts here, we affirm the lower court decisions and uphold McCray's conviction.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.